**In re SYNDICOM CORPORATION, Debtors.**

**No. 01 B 41517(REG).**

United States Bankruptcy Court, S.D. New York.

Aug. 23, 2001.

Handler & Goodman LLP, by Robert S. Goodman and Arthur Handler, New York City, for Shoichi Takaya.

Stuart A. Jackson, P.C., by Stuart A. Jackson, New York City, for the Debtor.

Lewis W. Siegel, by Lewis W. Siegel, New York City, for Stuart R. Ross.

Carolyn S. Schwartz, United States Trustee, by Greg M. Zipes and Richard Morrissey New York City.

## MEMORANDUM OF DECISION AND ORDER ON MOTION FOR RELIEF FROM STAY, OR, ALTERNATIVELY, FOR DISMISSAL OF CASE

ROBERT E. GERBER, Bankruptcy Judge.

Shoichi Takaya, the landlord of the apartment in which the Debtor's principals reside (and as to which the lease is in the name of the Debtor), moves, pursuant to sections 362(d)(1) and 1112(b) of the Bankruptcy Code, for relief from the stay, to continue eviction proceedings with respect to the apartment, or, alternatively, dismissal of this chapter 11 case. For the reasons that follow, the Court determines that cause for each of the requested prayers for relief has been shown, but, on balance, the Court considers the former relief more appropriate at this time; the Court grants relief from the stay to the extent the stay in any way prohibits eviction proceedings with respect to the apartment or a sale of the apartment, and denies the request for dismissal without prejudice. Factual presentations and briefs having been submitted by each party,[1] and oral argument having been completed, the following represents the Court's findings of fact and conclusions of law, and bases for the exercise of discretion, in connection with the motion.[2]

### Introduction

This chapter 11 case, in contrast to the bulk of the chapter 11 cases before this Court, where the debtor's ability to reorganize will determine the livelihood of many employees and/or the ability of numerous vendors, lenders and tort litigants to be paid on their claims, involves much more parochial concerns. The Debtor is not an operating business; indeed, the Debtor has been dissolved by the New York Secretary of State. So far as the record has revealed, none of the scheduled claims against it arise from business operations. But it is the lessee of record of a condominium apartment located at Trump Palace, 200 East 69th Street, Unit 19C (the "Apartment"), leased by the unit owner Mr. Takaya, and occupied by the debtor's sole stockholders, Stuart R. Ross, and

---

1. Mr. Takaya initially submitted a June 5 "Ex Parte Motion to Dismiss Case with Prejudice, Terminating the Automatic Stay Nunc Pro Tunc, Awarding Sanctions and Attorneys' Fees Against Debtor's Attorney, and for Related Relief" (Docket # 4) (which, as noted below, the Court could not and did not consider ex parte, except to hear the motion, by order to show cause, on shortened time); the Debtor submitted "Syndicom's Response to Takaya's Motion to Dismiss and for Other Relief" (Docket # 8); the United States Trustee (the "UST") submitted a "Statement in Support of Motion to Dismiss the Case" (Docket # 13); and Mr. Takaya submitted a "Pre–Hearing Memorandum of Creditor–Landlord Shoichi Takaya" (Docket # 16). They are cited here as "Takaya Motion ____"; "Debtor Response ____"; "UST Statement ____"; and "Takaya Mem.____" respectively.

2. Under Fed.R.Civ.P. 52(a), made applicable to contested matters like this one under Fed. R. Bankr.P. 9014, findings of fact and conclusions of law are unnecessary on most motions, including one of the type at issue here. Nevertheless, given the importance of the matter to the parties, and its material impact on the Debtor, the Court considers it desirable to set the basis for its decision in detail here, albeit by the means of a memorandum of decision, authorized under Fed.R.Civ.P. 52(a).

his wife, Sheilah B. Ross (the "Rosses"). Disputes with respect to the Apartment precipitated the filing of this chapter 11 case in this Court.

So far as the record reflects, no Syndicom business operations are conducted out of the Apartment; the Debtor has had no income for each of the last three years. Over the last three years, however, the Debtor and the Rosses have been engaged in litigation in New York state court—in the Civil Court, Housing Part; Supreme Court, New York County, and in the Appellate Division, First Department—in a dispute with Mr. Takaya with respect to Mr. Takaya's duty to honor an option in Syndicom's favor for a purchase of the Apartment at a price that is now considerably less than market. Ultimately, that litigation involves who will get the profit when the Apartment is "flipped."

Though each of the parties to this two-party dispute has been a victor at one stage or another in the state court litigation, the most recent rulings have been in Mr. Takaya's favor, and while Syndicom has appealed a recent adverse decision of the Supreme Court to the Appellate Division, the Appellate Division denied Syndicom's request for a stay pending appeal. This case was filed one day before the expiration of a state court stay of the execution of a warrant of eviction, requiring the Rosses to vacate the Apartment.

The narrow issue before this Court is whether "cause" for relief from the stay, or dismissal, has been shown by Mr. Takaya under the facts of this case. In considering the "totality of the circumstances" under which decisions of this character are made, the Court is also called upon to consider whether bankruptcy courts should be used to facilitate the private agendas of litigants in two-party disputes, particularly where the interests of creditors are not served to any material extent thereby. Under the totality of the circumstances (where the two-party dispute is a significant factor, but not the only factor), this Court concludes that the invocation of the jurisdiction of the Bankruptcy Court for the purposes for which this Court was employed here was improper—particularly insofar as it had the effect (and, the Court finds, the purpose) of preserving the Rosses' right to occupy an apartment leased in the name of a shell corporation. The Court finds cause for each of relief from the stay and dismissal to be present here, but believes that, at least in the first instance, the former is more appropriate.

### Procedural Matters

■ This motion was filed on June 5, 2001, by a motion denominated by Mr. Takaya's former counsel as "ex parte." While relief from the stay can be granted on an ex parte basis under very limited circumstances (involving immediate and irreparable injury, and with procedural protections akin to those when a temporary restraining order is sought, *see* Bankruptcy Code section 362(f) and Fed. R. Bankr.P. 4001(a)(2)), a motion for relief of the character sought here could not be heard ex parte,[3] except to the extent that the Court could issue an order to show cause bringing it on for consideration on shortened time.[4] On June 13, the Court held an initial hearing on the motion. Based upon its concern that there might be material issues of disputed fact, the Court scheduled a continued, evidentiary, hearing for August 2. However, shortly before that August 2 date, counsel for Mr. Takaya informed the Court that Mr. Takaya waived the right to put on live witnesses, and would rely solely on the undis-

---

**3.** *See* Fed. R. Bankr.P. 4001(a)(2).

**4.** *See* Fed. R. Bankr.P. 9006(c)(1) and (2).

puted facts already in the record, and the documents Mr. Takaya's counsel had submitted to the Court (with copies to the Debtor), in anticipation of the upcoming hearing.[5]

On the day of the continued hearing, however (which the Court had announced would be non-evidentiary, and at which the Court expected it would hear oral argument and any contentions by the Debtor as to the existence of any disputed issues of material fact), the Court was advised by the litigants that they had settled the underlying two-party dispute, on terms announced on the record at the hearing; that Mr. Takaya accordingly would not press the motion; and that they would execute a settlement stipulation prior to a continued hearing set for August 7.

At the continued hearing on August 7, counsel for Mr. Takaya reported that the Debtor had failed to sign the settlement stipulation, without explanation, and had also failed to pay use and occupancy for the Apartment for August. The Debtor did not appear. The Court advised that if it did not hear by noon the following day that a settlement stipulation had been signed and the use and occupancy had

been paid, the Court would rule on the pending motion. The deadline was thereafter extended, by consent, in a conference call among representatives of the Debtor and Mr. Takaya, and the Court, to the morning of August 10, with the parties having once more been advised by the Court that if either the use and occupancy remained unpaid, or the stipulation had not been signed, the Court would immediately thereafter hear any witnesses on behalf of the Debtor, and oral argument.

Thereafter, on August 9, the Court received a letter from Stuart Jackson, Esq., the attorney for the Debtor, advising that while payment of the use and occupancy had been made, the Debtor had determined not to enter into the stipulation. The Court was further advised that the Debtor did not wish an evidentiary hearing, and wished only the opportunity to argue.[6]

Argument was initially scheduled for August 10, and then, over Mr. Takaya's objection, held instead on August 16, based on the unavailability of the Debtor's lawyer Mr. Jackson.[7]

Having considered the filings by and on behalf of the Debtor and Takaya, the docu-

---

**5.** Prior to the continued hearing the Debtor expressed no desire to put on live witnesses on its own behalf, though the Court understood that the Debtor had not procedurally forfeited its right to do so, and reserved the right to contend that it had the right to put on any witnesses that might help its case. An order of this Court scheduling the continued hearing likewise expressly preserved the Debtor's rights in that regard.

**6.** The Debtor's lawyer wrote, among other things, "we do not believe an evidentiary hearing is required, and therefore Syndicom requests that Your Honor hear closing arguments at the Court's convenience." (Ltr. of Stuart A. Jackson, dated Aug. 9, 2001).

**7.** On August 13, a time at which the Court was advised that the Debtor's lawyer Mr. Jackson was unavailable, another lawyer stat-

ing that he was speaking for the Debtor requested that *Mr. Takaya* be required to appear for live testimony. The Court denied the request. The Debtor had weeks to make such a request, if indeed the subject of the testimony was material, and its counsel had, as noted, advised the Court that "we do not believe an evidentiary hearing is required." *See* n. 6 above. The Court also found it ironic that while the Debtor chose not to put on Mr. Ross as a witness, to discuss the circumstances surrounding the filing and otherwise, it chose to haul in *Mr. Takaya* instead. Aside from the laches and waiver bases for denial flowing from the foregoing, the Court regarded the request as harassment and a litigation abuse. After the Court issued its order, it received a second letter on behalf of the Debtor (apparently written before the Court's ruling had been received by the Debtor) advising that the request was withdrawn.

mentary exhibits[8] and other undisputed facts, and oral argument, the Court determines the facts to be as follows.

## Facts

The Debtor is a New York corporation, whose sole shareholders are Stuart R. and Sheilah B. Ross.[9] They are its only directors.[10] The Debtor was dissolved by the New York Secretary of State on September 23, 1998, pursuant to Section 203–A of the Tax Law,[11] i.e., for failure to file required reports, and/or pay its franchise taxes.[12]

The Debtor's business was described by Mr. Ross as engaging "in the business of acquisition and resale of realty and intellectual property."[13] As described below, there is no such business, other than to the extent that the Debtor's desire to profit on the sale of the Apartment may be regarded as such. In November 1998, the Debtor, having ceased its business activities as a syndicator of animated television programs, began to wind up its affairs and was dissolved by proclamation.[14] That windup, assuming that it took place and indeed began in November 1998, took place exceedingly quickly, and the Court rejects, as not credible, the representation by Mr. Ross[15] that the windup is ongoing; for the entire year of 1999, the Debtor had no income and no loss, and indeed, the

Ironically, at the continued hearing on August 16, the Court was informed that Mr. Jackson would not argue for the Debtor, and that Mr. Ross (who had been present on August 10), with the Court's permission, would instead. Though the premise on which the continuance was granted had evaporated, the Court permitted Mr. Ross to argue as requested.

8. In this connection, the Court did not consider documents for the truth of the matter asserted except to the extent that an appropriate hearsay exception existed; e.g., it considered pleadings and letters exchanged in the parties' lengthy litigation and disagreements with each other only to the extent that they were admissions under Fed.R.Evid. 801(d)(2). When considering rulings and orders of the various state courts, the Court took them into consideration for their effect, without making a determination as to whether they were correct; the Court assumed that with respect to each of them, at least one party would contend that the ruling was not correct, and the Rooker–Feldman doctrine, see n. 99 below, makes such an inquiry inappropriate. A credit report on Mr. Ross (Takaya Exh. 32) has been wholly disregarded as hearsay.

9. Representation by Stuart Ross at Hrg. of Aug. 10, 2001.

10. Id.

11. Exh. 1 to Takaya Exh. 4.

12. N.Y. Tax Law § 203–A provides, in relevant part:

1 .... [T]he tax commission may certify and transmit to the department of state a list containing the names of any or all such stock corporations and corporations formed for profit ... as have not filed reports required under this article during the period of two consecutive years next preceding the date of such certification or as have been delinquent in the payment of taxes for any two years duly assessed pursuant to this article.

. . .

3. The secretary of state shall make a proclamation under his hand and seal of office, as to the corporations whose names are included in such list as finally corrected, declaring such corporations dissolved and their charters forfeited pursuant to the provisions of this section....
4. Upon the publication of such proclamation in the manner aforesaid, each corporation named therein shall be deemed dissolved without further legal proceedings.

13. Debtor's Affidavit Pursuant to Local Rule 1007–2 (Docket # 1) ¶ 2(a). See also n. 81 below.

14. Ross Aff. (Takaya Exh. 22) ¶ 3.

15. Representation of Stuart Ross, Tr. of Hrg. of 8/16/01 at 59.

Debtor had zero income from the operation of its business (nor, according to its Statement of Financial Affairs, did it operate at a stated loss) during each of the years 1999, 2000 and 2001.[16]

The Apartment is a condominium unit at Trump Palace, 200 East 69th Street, Unit 19C.[17] The Debtor and the Rosses have occupied the Apartment since October 1997, and originally agreed to a one-year lease, with an option to renew for a second year.[18]

From approximately September 1998 to the present, Mr. Takaya, the Debtor and the Rosses have been engaged in lengthy litigation, at three levels of the state court system. Discussion of some—but considerably less than all—of that litigation follows.

Disputes concerning the Property started in September 1998. At that time, Mr. Takaya commenced a summary "holdover" proceeding in the Civil Court of the City of New York, New York County (the "Housing Court"), against Syndicom, Mr. Ross, and Mrs. Ross.[19] As set forth in the holdover proceeding petition and as described in the later decision of the Housing Court,[20] Mr. Takaya alleged that the lease to the Apartment expired by its terms on August 31, 1998, and an option on Syndicom's part to renew the lease or purchase the Apartment was not exercised.[21]

Approximately five months after the commencement of the holdover proceeding, in February 1999, a flood damaged the Apartment, making the Apartment, as alleged by the Debtor, "uninhabitable for periods of time during the tenancy,"[22] and the Apartment was not repaired until June 12, 1999 "solely due to the wilful disregard and/or negligence of Syndicom's rights by Mr. Takaya."[23] In March 1999, in the midst of a lengthy trial,[24] the Debtor and the Rosses entered into a Settlement Stipulation in the Housing Court (the "Settlement Stipulation").

The Settlement Stipulation provided, among other things, for "final judgment of possession in favor of Petitioner Takaya, warrant forthwith, execution stayed," on terms that were set forth in the Settlement Stipulation.[25] They included, among others, the release to Mr. Takaya of certain use and occupancy that had been paid into the Housing Court; additional rent arrears to be paid to Mr. Takaya; and one month of use and occupancy (for February 1999) to be waived.[26] They also included—significantly here—an option on the Debtor's part to purchase the Apartment, for $875,000, exercisable on or before July 30, 1999 (with a deposit to be made on that

16. Statement of Financial Affairs (Docket # 6).

17. Takaya Exh. 2 ¶ 2.

18. Takaya Exh. 2 ¶ 4.

19. *Takaya v. Syndicom Corp., Stuart R. Ross and Sheilah B. Ross,* L & T Index No. 95624/98. *See* Takaya Exh. 36.

20. Takaya Exh. 10. Judge Elsner was ruling on a Takaya motion for contempt and a money judgment for nonpayment of use and occupancy under an earlier Housing Court order of September 1999.

21. *Id.* at 2.

22. Takaya Exh. 2 ¶ 5.

23. *Id.*

24. Debtor Response Exh. B at 2; Takaya Exh. 10 at 2.

25. Exh. 5 ¶ 1.

26. *Id.*

day of $87,500),[27] and a commitment by the Debtor and the Rosses, if the option deposit was not delivered by that July 30 deadline, to vacate the Apartment by August 31, 1999.[28]

The Debtor did not pay the down payment to exercise the option on or before July 30, 1999. About nine hours before the deadline, it sought and obtained a temporary restraining order ("TRO") in a new litigation that the Debtor commenced in the Supreme Court, New York County (the "Supreme Court"), similar in concept to an action for a "Yellowstone Injunction," tolling the time for it to do so. However, following further litigation after the issuance of the TRO, the Supreme Court vacated the TRO. On August 4, 1999, after the adverse ruling (but within nine hours thereof), the Debtor attempted to exercise the option, and make the deposit, at which time Mr. Takaya rejected it.[29]

Further litigation between Mr. Takaya and the Debtor ensued, in both the Housing Court and the Supreme Court; most significantly, the Supreme Court ruled that the Debtor's August 4, 1999 exercise of the option was untimely.[30] However, the Debtor took an appeal of that decision to the Appellate Division, First Department (the "First Department"), and on September 28, 2000, the First Department reversed.[31] It held, in substance, that the earlier Supreme Court TRO had tolled the

time for exercise of the option, upon which the Debtor was entitled to rely, and that after the Supreme Court ruled against the Debtor and vacated the TRO, the Debtor retained a residual nine hours to exercise the option.[32]

Implementing the ruling of the First Department, in a decision dated March 20, 2001, the Supreme Court found that the Debtor was entitled to specific performance of its purchase contract, on condition that the Debtor tender a down payment as specified in the option agreement within 10 business days of service of a copy of the order with notice of entry.[33] The Supreme Court further held that if the Debtor did not make such a tender, it would not be entitled to specific performance;[34] the closing between the Debtor and Mr. Takaya was required to take place within 90 days after the down payment was deposited.[35]

A motion for reargument by the Debtor was denied.[36] In the decision doing so, the Supreme Court also denied a request by Mr. Takaya for ejectment on motion, as there had been no cause of action asserted by Mr. Takaya seeking such relief. However, in that connection the Supreme Court observed that the Debtor "no longer has any arguable right to possession of the Apartment...."[37]

27. *Id.* ¶ 1(g).

28. *Id.* ¶ 3.

29. Exh. 9 at 2.

30. Ross Aff. (Debtor Response Exh. A) at ¶ 17.

31. *Syndicom Corp. v. Takaya*, 275 A.D.2d 676, 714 N.Y.S.2d 256 (1st Dept.2000).

32. *Id.* This does not purport to be a complete discussion of the First Department decision, the interpretation and implementation of which is now before the state courts. The

Court believes that it is inappropriate for the Court to engage in that, and such is unnecessary to a resolution of the bankruptcy issues that are before this Court.

33. Takaya Exh. 13 at 3.

34. *Id.*

35. *Id.*

36. Takaya Exh. 14.

37. *Id.* at 2.

The Debtor did not tender the down payment (which was $87,500, 10% of the $875,000 purchase price), though there were vitriolic exchanges between counsel for the Debtor and Mr. Takaya as to whether a payment into a trust account for that purpose had been made,[38] and the Debtor, presumably later, sought to have a prospective buyer to whom the Debtor would sell the Apartment put up the deposit on the Debtor's behalf[39]—a request rejected by Mr. Takaya.

On May 8, the Debtor once more appealed to the First Department, and, in connection with its appeal, sought a "protective order," in the words of the Debtor,[40] or an "interim stay," in the words of Mr. Takaya.[41] The Debtor made this request because the Debtor was unable to tender the $87,500 deposit within the period directed by the Supreme Court, and Mr. Takaya refused to accept a third party purchaser's cash payment of $875,000 for the Apartment.[42] On May 11, the First Department, acting by one justice of that court, granted the request for the interim stay, but on conditions: a stay pending a hearing on injunctive relief until determination of the appeal was conditioned by the First Department upon the Debtor's depositing $87,500 in escrow within three days after the issuance of the First Department Order.[43] Syndicom was unable to deposit the required deposit.[44]

After Mr. Takaya's motion was filed in this Court (and after the initial June 13 argument on the motion in this Court), the First Department, this time acting by a five-judge panel of its justices, denied a stay outright, and vacated the earlier May 11 conditional stay.[45] The First Department's order, dated June 19, 2001, provided, in relevant part:

> And plaintiff-appellant [Syndicom] having moved for a stay of execution and enforcement of the order pending hearing and determination of the aforesaid appeal, for a stay of eviction, and other related relief,
>
> · · ·
>
> It is ordered that the motion is denied and the interim relief granted by an order of a Justice of this Court on May 11, 2001 is vacated.

The Debtor's appeal to the First Department has not been perfected.[46] Under the Rules of the First Department, steps to do so are now overdue.[47] There is a nine-month limitation on taking the steps necessary to perfect the appeal, though it does not extend the time of any party to take

---

38. *See, e.g.,* Takaya Exh. 15. It has not been considered for the truth of the matter asserted therein.

39. Debtor Response at ¶¶ 25–28.

40. *Id.* ¶ 28.

41. Takaya Motion Exh. F, ¶ 1, n. 1.

42. Debtor Response ¶ 28.

43. *Id.; accord* Takaya Motion Exh. F at ¶ 1, n. 1.

44. Debtor Response ¶ 28. Counsel for Mr. Takaya states "no check was delivered." (Takaya Motion Exh. F at ¶ 1, n. 1).

45. Takaya Exh. 34. Presumably because the Supreme Court action, from which an appeal was taken to the First Department, was always by the Debtor and not against it, neither party has suggested that the proceedings in the First Department are or were barred by the automatic stay.

46. Representation of Stuart Ross at Hrg. of Aug. 10, 2001.

47. *See* 22 NYCRR § 600.5(d), § 600.11(a)(1) and (2).

any step in connection with the appeal.[48]

Meanwhile, the Debtor was also litigating in the Housing Court. On August 4, 2000, the Housing Court adjudged the Debtor and the Rosses in contempt of court for non-payment of use and occupancy of the Apartment, and issued a money judgment in Mr. Takaya's favor for that use and occupancy in the amount of $18,270.[49] On February 6, 2001, based on determinations made in the higher courts, the Housing Court denied a request by Mr. Takaya for a vacatur of the Housing Court's earlier stay of eviction, based on the failure of the Debtor to pay use and occupancy, without prejudice to the parties' rights in the higher courts.

On April 27, 2001, the Housing Court issued a decision and order, based in part on the earlier Settlement Stipulation and in part on the March 20, 2001 decision of the Supreme Court.[50] The Housing Court noted that it was "undisputed" that the Debtor failed to comply with the Supreme Court's order of March 20, and, as set forth by the Supreme Court, "no longer has the right to specific performance, i.e., exercise its option to purchase the premises at issue."[51] The Housing Court ordered that "a warrant of eviction shall issue forthwith," but provided that execution of the warrant was stayed through May 25 of this year.[52] On or about May 17, the Housing Court issued the warrant of eviction, and on May 24, a marshal issued a Notice of Eviction (formerly known as a "72–hour notice"), advising the Rosses that they could be evicted, without further notice, on the sixth day after the Notice of Eviction's May 24 date.[53]

On May 24, one day before the Housing Court's stay of execution of the warrant would expire,[54] the Debtor filed its petition under chapter 11.[55]

When the Debtor filed, it had no proceedings pending to vacate the warrant, either in the Housing Court, which issued it, or in the First Department, where its appeal is pending.[56] The Court additional-

---

**48.** While Mr. Ross described this, in substantially these words (the transcript not yet being available), as "we have nine months to perfect the appeal" (Representation of Stuart Ross at Hrg. of Aug 10, 2001), the Court believes that the above formulation is more precise. *See* 22 NYCRR § 600.11(a)(3). The relevant First Department rule provides, in relevant part:
The clerk will place no civil appeal or cause on the calendar where the necessary papers and briefs are not offered for filing within nine months of the date of the notice of appeal .... unless the time for filing has been enlarged by order of the court. This nine-month limitation applies to all appeals ... and may not be extended by agreement or stipulation of the parties. This paragraph does not extend the time of any party to take any step in connection with any appeal or cause. Such times are fixed by other rules and statutes and the time periods fixed by such other rules and statutes must be complied with.
However, because serious consequences do not seem to attach until the expiration of the nine-month period, the Court does not need to consider the effect, if any, of Bankruptcy Code section 108(b) on the time for the Debtor to take necessary steps up to this point in time.

**49.** Takaya Exh. 10 at 8; Takaya Exh. 11.

**50.** Takaya Motion Exh. J, which also is Takaya Exh. 16.

**51.** *Id.* at 1.

**52.** *Id.* at 3.

**53.** Takaya Exh. 17.

**54.** Takaya Motion Exh. J. at 3.

**55.** Petition (Docket # 1).

**56.** *See* Tr. of Hrg of 8/16/01 at 52 ("Now we did not go to the Civil Court. We will take our chances with the Appellate Division that is fully aware of the situation."). As noted above, on June 19, the First Department de-

ly finds as a fact, or as a mixed question of fact and law, that there is no link between the claimed right to specific performance and/or the right to assign the purchase agreement to a third party, as sought in the First Department, and the possessory interest in the Apartment held by the Debtor and the Rosses that is the subject of the warrant of eviction.

The Debtor has never contended that it needs the Apartment for business operations. It does not intend to stay in the Apartment,[57] at least for more than a minimal period of time;[58] it only wishes the right to sell it, and derive the profits thereon. As recently as August 9 of this year, the Debtor has acknowledged that it will leave the Apartment,[59] and the signifi-

cance of the state court litigation now is wholly or substantially, the Debtor's ability to "flip" the Apartment—i.e., buy it and, immediately or shortly thereafter, sell it to a third party, thereby making the profit on the resale.[60]

All but $3,000 of the Debtor's scheduled assets, said to total $659,000,[61] consist of alleged contractual or litigation rights with respect to the Apartment.[62] These include:

| | |
|---|---|
| Value of agreement to buy Apartment | $400,000; [63] |
| "Claim against Takaya for overpaid use and occupancy" | $ 76,000; [64] |
| "Claim against Takaya for legal fees in State Court action (estimated $125,000)" | $125,000; [65] |
| "Claim against Takaya for damages to Condominium premises and repair | |

nied a stay of eviction. *See also id.* at 72 ("there has been no challenge to the warrant of eviction").

Later in oral argument, Mr. Ross asserted that "we are attacking warrants through the Appellate procedure," *id.* at 89, *accord id.* at 38, impliedly asserting there to be a link between the Debtor's claimed right to assign the contract for purchase of the Apartment and its possessory right, a linkage which the Debtor twice disclaimed and the Court rejects.

57. Tr. of Hrg. of 6/13/01 at 74, 75 (twice), 76. *See also* Ltr. Of Stuart A. Jackson, dated Aug. 9, 2001, described in n. 59 below ("such a result [granting Takaya relief from the stay] would be reasonable if there is a reasonable opportunity to vacate the premises and find other accommodations"). The Court finds this as a fact notwithstanding Mr. Ross's recantation of his earlier statements expressing his willingness promptly to leave. *See* n. 58 below.

58. The Court qualifies this finding in the manner noted by reason of Mr. Ross's recantation of his earlier statements (four times at the Hearing of June 13, *see* n. 57 above), expressing his willingness promptly to leave. On August 16, he told the Court that by reason of stated difficulties in finding a suitable alternate apartment, he wished to continue his

occupancy of the Apartment and resist relief from the stay and eviction.

59. Ltr. of Stuart A. Jackson, dated Aug. 9, 2001 ("Syndicom recognizes that Your Honor may lift the stay without dismissing the case, and we believe that such a result would be reasonable if there is a reasonable opportunity to vacate the premises and find other accommodations. As Syndicom is willing to pay reasonable use and occupancy for the period it remains on the premises, we believe that such a ruling would not prejudice Takaya's rights.").

60. *See* Debtor Response ¶ 25 (Syndicom "located a buyer who agreed to pay Syndicom $1,200,000 for the Condominium").

61. Docket # 6, Summary of Schedules.

62. *Id.*, Schedule A, Real Property.

63. This is based on an estimated fair market value of the Apartment, said to be between $1,200,000 and $1,300,000, *id.*, and presumably is based on the difference between the fair market value and option price.

64. Docket # 6, Schedule B, "Personal Property."

65. *Id.*

costs" $ 55,000 [66]

"Desk; chair; computer; telephone equipment, stationery, scanning (sic.) equipment, fax machine; software (estimated repalcement (sic.) cost)" $ 3,000.[67]

The Debtor has no cash on hand, nor in bank accounts.[68] Despite its statement as to the nature of its business, it has no patents, copyrights or other intellectual property.[69]

The Debtor's listing of Creditors Holding 20 Largest Unsecured Claims, as set forth on the filing date, listed only five creditors. They were:

| | | |
|---|---|---|
| Shatz, Meier, Franzind Scher, LLP. | Legal Services | $80,000 |
| Fleet Bank | Overdraft Loan | $ 3,500 |
| NY State Tax Dept | Corporate Tax | $10,000 |
| Stuart A. Jackson | Legal Services | $22,000 |
| Stuart R. Ross | Wages | $60,000 |

The instructions for that listing direct that it should not include "persons who come within the definition of 'insider' set forth in 11 U.S.C. § 101 . . . ." Mr. Ross plainly is such. The Shatz Meier firm was the attorney for the Debtor, as was Mr. Jackson. Removing from consideration Mr. Ross, Shatz Meier, and Mr. Jackson, only two independent creditors remain.

The Schedule of Liabilities filed by the Debtor after the filing did not differ significantly. The "wages" claim said to be held by Mr. Ross increased from $60,000 to $68,000,[70] and the total tax claims in-

creased from $10,000 to $11,000, with the corporate tax claim held by New York State (said to be estimated) decreased from $10,000 to $6,000, and a new creditor, the New York City Department of Finance, having been added, with a corporate tax claim (again said to be estimated) of $5,000.[71] Two other creditors, one of whom was Mr. Takaya, were scheduled at zero amounts, and with disputed claims.[72]

No evidence was submitted indicating that any creditor was placing any pressure on the Debtor other than Mr. Takaya— and Mr. Takaya' efforts were focused on gaining possession of the Apartment being occupied by the Rosses, and, until possession was obtained, use and occupancy while the Rosses continued to occupy the Apartment. Other than in litigation brought by Mr. Takaya, there were, at the time of the filing, no actions or proceedings pending or threatened against the Debtor where a judgment against the Debtor or a seizure of the Debtor's property was imminent.[73] No property of the Debtor was attached, garnished or seized under any legal or equitable process in the year preceding the Debtor's filing.[74] Nor was any property repossessed by a creditor, sold at foreclosure sale, transferred through a deed in lieu of foreclosure, or returned to a seller in the year before the case was filed.[75]

66. *Id.*

67. *Id.*

68. *Id.*

69. *Id.*

70. Docket # 6, Schedule E, Creditors Holding Unsecured Priority Claims.

71. *Id.,* Schedule F, Creditors Holding Unsecured Priority Claims.

72. *Id.* Any amounts due to Mr. Takaya by reason of unpaid rent or use and occupancy

were scheduled at zero, in contrast to having been scheduled in the amount of Takaya's judgment for the use and occupancy but as "disputed."

73. Debtor's Rule 1007–2 Affidavit (Docket # 1) ¶ 12

74. Schedule of Financial Affairs (Docket # 6) ¶ 4(b).

75. *Id.* ¶ 5.

The Debtor does not intend to continue its business.[76] Its only officers are Stuart R. Ross, president and C.E.O., and Sheilah B. Ross, Secretary and Treasurer.[77] It has no employees other than its officers.[78] It predicted that for the 30 days after its filing, each of its cash receipts; cash disbursements; net cash gain or loss; and accrued, but unpaid, obligations (other than professional fees) would be "NONE." [79]

Based on those facts, and the totality of the circumstances, as described and documented above, the Court makes the following additional findings of fact.[80]

(1) The Debtor is a shell corporation with no employees, no business, no intention to continue in business, no income, no significant assets other than litigation and/or contract rights (if any) vis-à-vis Mr. Takaya, and no business purpose other than as a vehicle for the convenience of the Rosses.

(2) This case, for all practical purposes, arises as a consequence of, and represents a continuation of, a two-party dispute between the Debtor and/or the Rosses, on the one hand, and Mr. Takaya, on the other.

(3) This case was filed with the predominant purpose of blocking measures by Mr. Takaya, authorized by the state courts, to effect the eviction of the Rosses (who were occupying the Apartment leased in the name of the Debtor), and in particular to utilize the automatic stay provided by section 362 of the Bankruptcy Code with respect to the Apartment to block Mr. Takaya's remedies.[81]

(4) To the extent this case was not filed for the purpose of blocking measures by Mr. Takaya to evict the Rosses, it was filed to secure for the Rosses, by utilization of the Debtor and the Bankruptcy Code, the profit on "flipping" the Apartment to a third-party purchaser.

(5) This case was filed with the both the effect and the purpose of securing benefits for non-debtor individuals, the Rosses—i.e., continued occupancy of the Apartment and the profit on the Apartment's resale—in contrast to securing benefits for the Debtor corporation, which has no ongoing business, no em-

---

**76.** Debtor's Rule 1007–2 Affidavit, (Docket # 1) ¶ 14.

**77.** *Id.* ¶ 13. Despite the requirements of Local Rule 1007–2, the Debtor failed to provide their tenure with the Debtor and experience, or, more importantly, their relevant responsibilities.

**78.** *Id.* ¶ 15.

**79.** *Id.* ¶ 17 (capitals in original).

**80.** Several of these are closely similar to facts found to be present in other abusive cases wherein the Court found cause for relief from the stay under Bankruptcy Code section 362(d)(1), or for dismissal under Bankruptcy Code section 1112(b). Needless to say, the Court has individually considered them before determining whether findings of that character are appropriate here.

**81.** The Debtor's affidavit under Local Rule 1007–2 stated, with respect to the purpose of the filing:

(a) Debtor is in the business of acquisition and resale of realty and intellectual properties.

(b) Debtor's Chapter 11 results from a cash liquidity deficit.

(Affidavit Pursuant to Local Rule 1007–2 ¶ 2). That minimally descriptive, and arguably cute, explanation hardly provides the Court with a basis for finding any appropriate purpose for its bankruptcy filing. If the "realty" that the Debtor was in the business of "acquisition and resale" included anything other than the Apartment, the Debtor did not provide any proof of that. If the intellectual property as to which the Debtor was in the business of acquisition and resale now exists, the Debtor likewise offered no proof of that; its Schedule of Assets (Docket # 6) revealed no such property.

ployees, and zero income or loss for at least the last three years, and which was under no financial pressure from creditors other than Mr. Takaya during that time; the bankruptcy case was filed to facilitate a prospective profit (i.e., to obtain a prospective valuable asset), rather than to satisfy debt.

(6) This case was filed as a tactical step in connection with the Debtor's state court battles with Mr. Takaya, and with the purpose of securing a tactical advantage in the Debtor's battles with Mr. Takaya.

(7) The timing of the Debtor's filing evidences an intent to hinder, delay and/or frustrate the efforts of Mr. Takaya to enforce his rights to possession of the Apartment.

(8) There is a lack of unsecured creditors in any material numbers whose interests are affected in any way by this chapter 11 case.

(9) Unsecured creditors would not benefit in any material way as a consequence of the filing, or be prejudiced, in any material way, by relief from the stay, or dismissal of the case.

(10) This case was filed in bad faith.

*Discussion*

Though the vitriol of the underlying state court litigation tends to unnecessarily lengthen movant Takaya's papers, raise issues not particularly cognizable as matters of bankruptcy law, and cloud the basic bankruptcy points, those basic points are nevertheless straightforward. Takaya argues, in substance, that the case was filed not for the purpose of reorganization, but rather as a means of securing bankruptcy protection and leverage in connection with a private two-party dispute—and, in particular, protecting the Rosses, by reason of the Debtor's automatic stay, from the imminent eviction that had been authorized in state court.[82] Takaya also argues that as a consequence of the rulings in state court before the filing, the Debtor now has no interest left in the Apartment to protect. Takaya argues that for this reason and also because the case is a bad faith filing, "cause" exists for each of relief from the stay, or, alternatively dismissal of the case.[83]

The UST filed a statement supporting the motion to the extent it seeks the latter relief,[84] asserting that the Debtor had failed to abide by its basic fiduciary obligations in the case,[85] had failed to file its initial monthly operating report, and had failed to pay the quarterly fees required under 28 U.S.C. § 1930.[86]

---

**82.** In the words of Mr. Takaya's counsel:
Ross filed the instant Petition on the very day he, his wife and the Debtor were all served with a Notice of Eviction by the City Marshal. Ross, a former bankrupt, who has judgments against him in the amount of more than $500,000, filed the within Petition as the Debtor's alleged president in order to stay his own eviction (and the eviction of his wife) as former undertenants of the Debtor.
Takaya Motion ¶ 3.

**83.** Takaya Motion ¶¶ 33–37.

**84.** The UST does not take a position, either way, with respect to the former.

**85.** UST Statement in Support of Motion ¶ 1.

**86.** *Id.* At a hearing on August 10, the UST requested that the Court direct the filing by the Debtor of an operating report (limited, if necessary, to set forth no more than disbursements from the estate) and pay its quarterly fees. The Court granted that request, and the Court has been advised that the operating reports have been filed and payment of the fees has been promised. The UST continues to support the motion insofar as it seeks dismissal. She takes no position with respect to the relief from the stay.

■ The Debtor opposes the motion.[87] Like its state court adversary Mr. Takaya, it devotes substantial energy arguing the merits in the Syndicom state court litigation.[88] But its arguably bankruptcy-related points, ultimately, are that it "filed to protect the interests of Syndicom (and therefore Syndicom's creditors) in the Condominium";[89] that it filed the case not to overrule the substantive decisions of the state courts, but to "prevent a forfeiture of Syndicom's most valuable asset, and per-mit a meaningful appeal in the state courts";[90] that it "is confident" that the First Department will reverse the Supreme Court,[91] and that if the First Department does so, the Debtor will be able "to propose and confirm a chapter 11 plan paying its creditors 100% of their claims";[92] and that, because Mr. Takaya is a non-resident foreign national, "the assets may not be subject to recapture" once Syndicom is successful on its appeal to the First Department.[93]

87. The Debtor's response was in the form of an affirmation from Mr. Ross (who is an attorney admitted to practice in the courts of the state of New York, and who is also Syndicom's president), which included a combination of typical statements of fact (historic or otherwise), "facts" which are essentially rhetoric or factual argument, and legal argument. The factual statements in the first category (e.g., the value of the Apartment "is in excess of $1,200,000") are taken as true for the purposes of the motion; those in the second category (e.g. "But for Takaya's greed," the Apartment would have been sold to Syndicom years ago, and Takaya would have received the agreed upon Option price) have been regarded merely as argument. The statutory and caselaw argument has been considered as would the argument in any litigant's brief. Mr. Ross elected not to testify, and the Court believes, as noted, that it can determine the motion on the undisputed facts.
At the August 16 oral argument, Mr. Ross sought to make assertions of fact unsupported in the record. The Court declined to let him make unsworn assertions of fact unaccompanied by an opportunity for cross-examination, see Tr. of Hrg. of 8/16/01 at 37, and noted that in Mr. Jackson's August 9 letter, the Debtor had announced that it did not wish an evidentiary hearing. See n. 6 above. Though he did not thereafter actually ask for an evidentiary hearing on the spot, or for another adjournment to permit one, Mr. Ross implied that he nevertheless should not be held to his counsel's earlier statement to the Court in this regard. The Court rejects the notion that the statements of counsel to the Court can be disregarded so cavalierly. As the Court noted in its order (Docket # 17) denying the Debtor's request to require Mr. Takaya to testify at the August 16 hearing after Mr. Jackson had agreed that it would be non-evidentiary, the Court necessarily needs to be able to rely upon the representations, and commitments, of counsel, as do litigants, who justifiably rely on their adversaries' representations.

88. See Debtor Response ¶¶ 2, 4. 6,–8, 10, 16, 18, 19, 21. See, e.g.:

This motion, and the voluminous litigation in state court, are a result of Takaya's continuing attempt to avoid his contractual obligation to sell Syndicom (or Syndicom's assigns) the condominium apartment unit 19C at 200 East 69 Street (the "Condominium") so that he can get more than he bargained for.
(Debtor Response ¶ 2).
But for Takaya's greed, the Condominium would have been sold to Syndicom years ago and Takaya would have received the agreed upon Option Price.
Id. ¶ 6.

89. Debtor Response ¶ 31.

90. Id. ¶ 33.

91. Id. ¶ 32.

92. Id. ¶ 30.

93. Id. ¶ 36. The Debtor also argues that under the Second Circuit's decision of In re Cedar Tide Corp. 859 F.2d 1127 (2d Cir.1988), denying a dissolved corporation the benefits of reorganization or liquidation would be contrary to the central purposes of the Bankruptcy Code. (Debtor Response ¶ 37). Mr. Takaya distinguishes Cedar Tide on the ground that the debtor there had been officially reinstated within six months of its bankruptcy filing (Takaya Motion ¶ 28), and that distinction has

The Court prefers to consider the motion in the context of the statutory language of sections 362(d)(1) and 1112(b); the caselaw construing "cause" as used in each; and the factors set forth in the caselaw to be considered by the Court in exercising its discretion in determining motions under sections 362(d)(1) and 1112(b). To the extent that the arguments described above are relevant to those matters, they will be considered accordingly.

## I.

### General Standards

Section 362(d)(1) of the Bankruptcy Code provides, in relevant part:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—

(1) for *cause*, including the lack of adequate protection of an interest in property of such party in interest.....

(Emphasis added).

Similarly, section 1112(b) of the Bankruptcy Code provides, with an exception not relevant here:

arguable merit. *See In re C–TC 9th Avenue Partnership*, 113 F.3d 1304 (2d Cir.1997) ("We held [in *Cedar Tide*] that, while [NY BCL § 1006] limited a dissolved corporation to those activities involved in the winding up of its affairs, [NY Tax Law § 203] allowed a dissolved corporation to be reinstated *nunc pro tunc* upon the filing of a certificate indicating that all taxes, penalties, interest and fees had been paid").

Nevertheless, this Court assumes, without deciding, that with the Debtor's ability to pay the unpaid taxes and/or to liquidate in chapter 11, *Cedar Tide* nevertheless controls, and that the Debtor's dissolution does not disqualify it from resort to the Bankruptcy Code for that reason. When considering the totality of

[O]n request of a party in interest or the United States trustee..., and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of [the Bankruptcy Code] or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for *cause*, including [10 enumerated circumstances].

(Emphasis added).

 The decision of whether to lift the stay is committed to the discretion of the bankruptcy judge. *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)*, 907 F.2d 1280, 1286 (2d Cir.1990). Likewise, the Bankruptcy Court has broad discretion to dismiss a chapter 11 case for cause. *See, e.g., In re Woodbrook Associates*, 19 F.3d 312, 316 (7th Cir.1994).

 The burden of proof on a motion to lift the automatic stay is a shifting one; section 362(d)(1) requires an initial showing of cause by the movant; then, with the exception of the debtor's equity in the property (which is not at issue on a motion under section 362(d)(1), like this one), section 362(g) places the burden of proof on the debtor for all other issues. *Sonnax*, 907 F.2d at 1285.[94]

the circumstances in connection with the motion, as the Court is required to do, and does, below, the Court will not consider dissolution as a factor, either.

**94.** Bankruptcy Code section 362(g) provides, in relevant part:

In any hearing under subsection (d) ... of this section concerning relief from the stay of any act under subsection (a) of this section –

(1) party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

11 U.S.C. § 362(g).

## II.

### "Cause" for Relief from the Stay and/or Dismissal

Mr. Takaya argues, as cause for relief from the stay to permit Syndicom (i.e., the Rosses) to be evicted, the termination of any landlord-tenant relationship as a consequence of the issuance of the state court warrant of eviction. He further argues, as cause for each of relief from the stay and dismissal, bad faith filing on the part of the Debtor. These will be considered in turn.

### A.

### Termination of Tenancy as Cause for Relief from the Stay

Mr. Takaya's first point is that by reason of the pre-petition termination of the lease, there is no longer any legally cognizable interest for the Debtor to protect. He notes that a warrant of eviction issued in accordance with the Settlement Stipulation in March 1999, thus terminating Syndicom's right to possession.[95] He then argues that what then remained pending actual physical eviction was at most merely "a naked possessory interest" which was wrongful, of minimal value to the estate, and incapable of serving as the basis of a reorganization.[96] He cites Judge Feller's decision in *In re Island Helicopters, Inc.*, 211 B.R. 453, 463 (Bankr.E.D.N.Y.1997), and this Court's decision in *In re Eclair Bakery Ltd.*, 255 B.R. 121 (Bankr.S.D.N.Y.2000) (Gerber, J.), for those propositions, and for the proposition that such constitutes cause for relief from the stay.[97]

Takaya's points are well taken in this regard. Relying on earlier analysis in *Island Helicopters* in the Eastern District of New York, and decisions of other judges in the Southern District of New York, this Court analyzed, in *Eclair Bakery*, the New York state law involving the termination of a tenancy upon the issuance of a warrant of eviction, and the state law's effect, as providing "cause" for relief from the stay, in a federal Bankruptcy Court. This Court held that the naked possessory interest was sufficient to require a motion for relief from the stay, under section 362(d), if the landlord wished to remove the tenant from possession. *See Eclair Bakery*, 255 B.R. at 133–134. But this Court also held that it was important not to confuse matters that entitled a debtor to stay protection in the first instance with matters relevant to whether the stay should be continued. *Id.* at 134.

*Eclair Bakery*, like many other bankruptcy cases in the Southern and Eastern Districts of New York (where debtors often lease, rather than own, their real property), involved whether or not there was "cause" for relief from the stay to proceed with eviction where a warrant of eviction had issued but the debtor, just before execution of the warrant, had filed a petition invoking section 362's automatic stay. That, of course, is the exact situation here.

■ With respect to the premise for relief from the stay—the end of the tenancy—this Court noted in *Eclair Bakery* that under New York RPAPL § 749(3), the issuance of a warrant of eviction cancels the lease between the parties and annuls the relationship of landlord and tenant.

---

**95.** Takaya Mem. 8. As noted above, another warrant of eviction issued on or about May 17, 2001; as each warrant of eviction terminated the tenancy or confirmed its earlier termination, it is unnecessary for the Court to determine under which of them Takaya will be proceeding.

**96.** *Id.*

**97.** *Island Helicopters* is also relevant with respect to the "bad faith" prong of the Takaya motion, discussed below.

*Id.* at 133. This Court went on to observe that:

> The filing of a bankruptcy petition does not resurrect a lease, and a Bankruptcy Court does not have the power to resurrect a lease which was terminated prior to the filing of a lessee's bankruptcy petition.

*Id.* at 133 n. 23. Subject to an exception, which the Debtor contends is applicable here (discussed below), the termination of the lease by reason of issuance of a warrant of eviction normally presents cause for relief from the stay.[98] It certainly provides a basis for a prima facie showing in that regard.

But in *Eclair Bakery,* this Court noted that under RPAPL § 749(3), there was a power vested in the state courts, even after the issuance of a warrant of eviction, "to vacate such warrant for good cause shown prior to the execution thereof." *Id.* at 136. With respect to that, this Court said:

> [W]here state court litigation under the escape valve provided under the second clause of RPAPL § 749(3) is pending, or the basis for good faith litigation is apparent … a continuation of stay protection, at least for a limited time, may be appropriate. By contrast, where state court litigation is not pending or in the cards, or where the debtor has failed to show any basis for a belief that the state court will grant relief, the prepetition termination of the landlord-tenant relationship will at least normally provide cause for relief from the stay.

*Id.*

 Here, while the termination of the Debtor's tenancy may not have resulted from application of RPAPL § 749(3) (but rather from the termination of the lease pursuant to its terms, and/or the determinations of the Housing Court and Supreme Court), the Court assumes that one or another of them (or the Appellate Term or the Appellate Division) would likewise have the power to vacate a warrant it had authorized. But even so, the issue on the 362(d)(1) prong of Mr. Takaya's motion here, as it was in *Eclair Bakery, see* 255 B.R. at 136, is whether the landlord, here Mr. Takaya, should be denied his right to execute on the warrant of eviction by reason of the residual possibility that the warrant might be vacated.

In *Eclair Bakery,* this Court, in synthesizing the earlier cases, noted that the cases varied in their bottom lines by reason of factual distinctions—and in particular, the presence or absence of a basis for the Bankruptcy Court to conclude that bona fide litigation is pending in the state court (or may, with a reasonable likelihood of success, be brought there), or timely cure was still possible. The Court makes a like inquiry here. In *Eclair Bakery,* when engaging in that process, this Court concluded that:

> On the facts of this case, there is no basis whatever for the exercise of any applicable power of this Court to protect the Debtor while it engages in further defaults and/or further delay, or to otherwise protect it from the termination of the Lease that has already resulted in state court.

*Id.* at 137.

The Court concludes likewise here. It does so not by reason of its independent scrutiny of the merits of the parties' arguments, or of the propriety of the Supreme Court's determination—both of which it

---

**98.** See the lengthier discussion in *Eclair Bakery* of the caselaw in the New York Bankrupt- cy Courts in this regard, 255 B.R. at 134–136.

considers inappropriate, under *Rooker–Feldman* [99]—but for two other reasons (1) because of what is now before the state courts (or, more to the point, what is *not* before the state courts), and (2) because of how the state courts have already ruled.

With respect to the former, the Debtor acknowledged at the August 16 argument that it has no pending motion before the Housing Court to vacate the warrant of eviction, nor does it have a pending request before the First Department for such relief.[100] Its appeal is to preserve its right of specific performance, and/or to secure and assign the right to buy without investment of cash and without first putting up a deposit. Thus Mr. Takaya is not asking this Court to cut the process short when there is pending before the state courts a request for the vacatur of the warrant of eviction that is the predicate for the requested relief from the stay.

With respect to the latter, after the First Department decision of June 19, this Court is not in a position to find that the debtor has shown a reasonable possibility that the state courts will vacate the warrant of eviction in the future. The First Department was expressly asked, as reflected in its June 19 order, "for a stay of eviction"—a milder form of relief than a full *vacatur* of the underlying warrant. Yet the First Department declined to grant even that, and it vacated an earlier order by one of its justices that had granted a stay (albeit on conditions) as interim relief. The state courts are in a far better position than this Court to judge the potential outcome in proceedings before them. Yet in substance the Debtor is asking this Court to impose a stay that the First Department denied, on the possibility that the state courts will find merit in arguments directed at vacating the underlying warrant when the First Department expressly rejected milder relief on June 19.

While the issues then considered by the First Department in its consideration of the Debtor's stay application might not have been wholly congruent with those this Court considers in determining whether there is sufficient fodder for litigation in the state courts, they overlap to a very great deal, and in the exercise of its discretion, this Court elects not to continue a stay, based on possible future success in litigation, when the First Department, faced with a request for milder relief, determined that it would not do so.

The Court's exercise of its discretion in this regard is informed by another factor as well. The Debtor has not shown that there is any link between success on its appeal (assuming it achieves a reversal) and its possession (or, more precisely, the Rosses' possession) of the Apartment. The Debtor's stated reorganization purpose is not the continuing use of the Apartment by the Rosses; it wants the profit on a "flip." Before he recanted it later in oral argument,[101] Mr. Ross twice

---

**99.** *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). *See also In re Dabrowski*, 257 B.R. 394, 405 (Bankr.S.D.N.Y.2001) (Gerber, J.), discussing the limitations imposed by *Rooker–Feldman* on Bankruptcy Courts.

**100.** *See* Tr. of Hrg. of 8/16/01 at 52. *See also* further discussion at n. 56 above.

**101.** *See* Tr. of Hrg. of 8/16/01 at 83 ("Well, I made a mistake. Forgive me. There is an absolute necessary linkage between specific performance and why the Debtor should continue in possession.").

acknowledged at the hearing on August 16 [102] that there "is no linkage" between the Rosses' possession of the Apartment and their ability to obtain specific performance.[103] Despite the recantation, the Court agrees. If the state courts ultimately determine that the Debtor is entitled to the profit, to exercise the option, and/or to assign the option or the right to purchase without putting up any money of its own, the state courts can fashion appropriate relief, such as damages or specific performance of a duty to convey. The Rosses do not have to be living in the Apartment to obtain either type of relief.[104]

Accordingly, even if this Court were to find, contrary to the foregoing, that the Debtor had a likelihood of success on its appeal on the merits of the Supreme Court order, it would not follow that the Debtor would also be entitled to vacatur of the warrant of eviction.[105] They are two separate things.

Cause for relief from the stay, based on the pre-petition issuance of a warrant of eviction, has been shown.

### B.

### *"Bad Faith" Filing as Cause for Relief from the Stay, and/or Dismissal*

█ It is well settled, of course, that the filing of a bankruptcy petition on the eve of a foreclosure or (as here) an eviction does not, by itself, establish a bad faith filing or "cause" for relief from the stay. *See, e.g., In re 234-6 West 22nd St. Corp.,* 214 B.R. 751, 757 (Bankr.S.D.N.Y.1997) (Brozman, C.J.) (so noting); *In re Eclair Bakery,* 255 B.R. at 137 (citing *234-6 West 22nd St. Corp); In re Kaplan Breslaw Ash,* 264 B.R. 309, 333 (Bankr.S.D.N.Y. 2001) (Gerber, J.) (citing the earlier cases). It is only one of several indicia that a court may appropriately look to in determining whether, under the totality of the circumstances, resort to the Bankruptcy Code

---

**102.** Tr. of Hrg. of 8/16/01 at 39 ("There is no linkage, Your Honor is quite right."); *id.* at 41 ("There is no linkage between us staying in the apartment and the sale of [the] apartment.").

**103.** He likewise acknowledged that it is not uncommon for litigants to seek specific performance of contracts to convey real property even when they are not in possession of it. *Id.* at 39.

Mr. Ross based his recantation on the possibility that Mr. Takaya might elect to lease the Apartment to someone else, for a lengthy term, thereby making a subsequent victory on the Debtor's part of dubious value, by reason of obligations to the new tenant, who might have leased the Apartment in good faith. *Id.* at 83–84. Assuming that to be true, that might be a basis for a state court order prohibiting Mr. Takaya from leasing the Apartment to such a person, but it would have nothing to do with whether the Rosses should be evicted, or, more to the point, whether the warrant of eviction should be vacated.

**104.** Indeed, having possession at the time of a request for such relief would be the exception, and not the rule.

**105.** Similarly, the Court is not at all persuaded that the Debtor needs a stay of eviction because Mr. Takaya is a "non-resident foreign national, who may depart the United States without notice for indeterminate periods of time or permanently, and that any sale of the Condominium by Takaya might result in the proceeds leaving the United States along with Takaya." (Debtor Response ¶ 36). The matter in dispute is real property within the state of New York, with respect to which numerous potential rights likely exist in rem. In any event, if and to the extent there is any real threat here, this Court is confident that the state courts, which are no less qualified than this Court to address such matters, can deal with it. And once more, the Court has difficulty seeing any nexus between the Debtor's right to secure the Apartment or its proceeds and preserving, for the Rosses, the temporary occupancy of the Apartment that blocking the eviction would accomplish.

has been in good faith, on the one hand, or inappropriate, on the other.

■ But the Second Circuit has commented on the importance of resort to the bankruptcy laws of the United States in good faith:

> The good faith standard applied to bankruptcy petitions "furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy."

C–TC 9th Ave., supra, 113 F.3d at 1310 (affirming dismissal of case, under Code 1112(b), for bad faith filing).

■ While each of Code sections 362(d)(1) and 1112(b) states that the relief authorized thereunder—relief from the stay or dismissal, respectively—may be granted for "cause" and lists one or more examples of cause, each precedes the list with the word "includes," and the factors provided as examples do not purport to be all of them. Rather, it is well established, consistent with the plain meaning of each of the two statutory provisions, that the circumstances following the "including" in each statutory provision are not exclusive. See, e.g., id. at 1311 ("It is important to note that this list is illustrative, not exhaustive");[106] see also Island Helicopters,

supra, 211 B.R. at 461–462 (to same effect).

■ Cause, for either dismissal or relief from the stay, may be found based on unenumerated factors, including "bad faith," see C–TC 9th Ave. Partnership, 113 F.3d at 1313,[107] or failure to deal with creditors fairly even where "bad faith" is not found. See In re Head, 223 B.R. 648, 653 (Bankr.W.D.N.Y.1998) (Kaplan, C.J.) (dismissing chapter 11 and 13 cases for "non-enumerated" cause, by reason of unfair debtor practices); Eclair Bakery, 255 B.R. at 137–138. See also In re Hudgins, 188 B.R. 938, 946 (Bankr.E.D.Tex.1995) ("cause" under section 362(d)(1) is not limited to those situations where the property of a party lacks adequate protection; instead, "cause" "encompasses many different situations").

■ As Chief Judge Brozman noted in 234–6 West 22nd St. (wherein she granted relief from the stay, under section 362(d)(1), by reason of bad faith filing), "the standards for bad faith as evidence of cause," whether in the context of dismissal or relief from the stay, "are not substantively different from each other." 214 B.R. at 757; see also In re Setzer, 47 B.R. 340, 344 (Bankr.E.D.N.Y.1985) ("[b]ad faith has frequently been held to provide sufficient cause to warrant both types of

---

**106.** The Second Circuit quoted the legislative history in this regard, which was consistent with, and reinforced, the plain meaning of section 1112. As supporting its observation, the Second Circuit stated:

> "[T]he list [contained in § 1112(b)] is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." House Report No. 95–595, 95th Cong., 1st Session at 405–6, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6363–64; see also In re Herrera, 194 B.R. 178, 190 (Bankr.N.D.Ill. 1996).

Id. at 1311 n. 5. Additional factors held by the Second Circuit to be relevant, although again not purporting to list them all, are discussed below.

**107.** As Judge Feller noted in Island Helicopters:

> The Second Circuit Court of Appeals has recently aligned itself with every other Circuit in affirming the view that bad faith is subsumed within the penumbra of "cause" warranting dismissal of a Chapter 11 petition under § 1112(b).

211 B.R. at 462.

relief"); *Eclair Bakery*, 255 B.R. at 138 (citing *234–6 West 22nd St.* and *Setzer*); *Kaplan Breslaw Ash*, 264 B.R. at 334(same).

 Judge Brozman cautioned, in this connection, that the concept of bad faith filing should be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances. *234–6 West 22nd St.*, 214 B.R. at 757. She then continued:

> [W]hen faced with a motion to lift the stay on bad faith grounds, a judge must conduct a careful analysis similar to that performed with a motion to dismiss a case on bad faith grounds. In both cases, the relief sought is an extraordinary remedy that requires careful examination of the facts on a case-by-case basis. But where the circumstances require such relief, and the cases granting both types of motions are legion, a judge must not shrink from ordering it.

*Id.*

 With respect to motions seeking a finding of cause based on bad faith, or a lack of good faith, once the good faith of a debtor is called into question, the burden shifts to the debtor to demonstrate that the petition was filed in good faith. *Stage I Land Co. v. U.S. Housing and Urban Development Dep't*, 71 B.R. 225, 229 (D.Minn.1986); *In re Powers*, 135 B.R. 980, 997 (Bankr.C.D.Cal.1991). Neither malice nor actual fraud is required to find a lack of good faith. As one District Court noted in *In re Grieshop*, 63 B.R. 657, 663 (N.D.Ind.1986), bad faith:

> may not be summarily equated with malfeasance and abuse. A debtor may simply be motivated by a desire to use any means at hand to preserve assets that are in jeopardy. Such acts of desperation do not necessarily imply active malfeasance directed at a given creditor. They may, however, illustrate a misuse,

as opposed to abuse, of bankruptcy procedure to the extent that the legitimate ends of bankruptcy law are frustrated by the debtor's actions.

*Id.* at 663. *See also In re Nesenkeag, Inc.*, 131 B.R. 246, 247 (Bankr.D.N.H.1991) ("Bad faith filing does not itself mean bad mind or malicious activity ... but simply the causing of a reorganization proceeding to be filed that does not fit within the intended scope of chapter 11 relief as that chapter [was] enacted by Congress"). As Judge Feller noted, in *Island Helicopters*:

> The good-faith requirement has long been the policing mechanism of Bankruptcy Courts to make certain that those who invoke the reorganization or rehabilitation provisions of the bankruptcy law do so only to accomplish the aims and objectives of bankruptcy reorganization philosophy and for no other purpose.

Indeed, in a formulation that appears in many of the cases, courts make a subjective and an objective inquiry into whether " 'there has been an abuse of the provisions, purpose or spirit' " of the Bankruptcy Code or the relevant chapter. *In re Love*, 957 F.2d 1350, 1357 (7th Cir.1992); *accord In re Weber*, 209 B.R. 793, 801 (Bankr.D.Mass.1997) (same); *Powers*, 135 B.R. at 994 (same); *In re Setzer*, 47 B.R. at 345 (Bankr.E.D.N.Y.1985) (same).

 As Judge Feller noted in *Island Helicopters*:

> Bad faith is not a concept that lends itself to precise definition. *See In re Charfoos*, 979 F.2d [390 (6th Cir.1992) ] at 393 ("[Bad] faith is an amorphous notion ....") (quoting *In re Okoreeh–Baah*, 836 F.2d 1030 (6th Cir.1988)). This court "may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or, in particu-

lar, factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of ... creditors to enforce their rights.'"

211 B.R. at 462.

■ Specific factors appropriate for consideration in determining whether cause exists based on bad faith filing were laid out by the Second Circuit in *C–TC 9th Ave. Partnership. See* 113 F.3d at 1311.[108] Those factors, which were stated in the context of a debtor dispute with a secured creditor, were:

(1) the debtor has only one asset;

(2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6) the debtor has little or no cash flow;

(7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8) the debtor has no employees.

113 F.3d at 1311 (citing *Pleasant Pointe Apartments, Ltd.,* 139 B.R. at 832); *see also Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Virginia (In re Phoenix Piccadilly, Ltd.),* 849 F.2d 1393, 1394–1395 (11th Cir.

1988) (laying out factors); *Little Creek Development Co. v. Commonwealth Mortgage Co. (In re Little Creek Development Co.),* 779 F.2d 1068, 1072–1073 (5th Cir.1986) (noting that findings of lack of good faith have been "predicated on certain recurring but non-exclusive patterns," based on "a conglomerate of factors rather than on any single datum," and also noting that "[d]etermining whether the debtor's filing for relief is in good faith depends largely upon the Bankruptcy Court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities").

Putting those principles together, the Court starts with the factors specifically identified in *C–TC 9th Ave.,* and then goes on to consider other factors relevant to legitimate reorganization purpose, and the absence of an abuse of the Bankruptcy Court, consistent with the teaching of *Island Helicopters* and the cases upon which the *Island Helicopters* court relied.

■ Here, under the totality of the circumstances, the Court finds this case to be extraordinarily similar in all material respects to *C–TC 9th Ave.*—which of course is authority binding on this Court—and the Court concludes that this case should be dismissed for cause for substantially the same reasons, particularly when other factors are considered as well. Addressing the *C–TC 9th Ave.* factors, or reasonable variants of them:

(1) Other than some flotsam and jetsam furniture and fixtures in the Apartment, the Debtor's only asset is its interest, to the extent it has one, in the Apartment, and the bundle of alleged contractual and litigation rights emerging from the Apartment option.

---

**108.** The Second Circuit extracted those factors, "as indicative of a bad faith filing," 113 F.3d at 1311, from *Pleasant Pointe Apartments, Ltd. v. Kentucky Housing Corp.,* 139 B.R. 828 (W.D.Ky.1992). The *C–TC 9th Ave.*

court ruled, when considering the facts in the case before it, that "[t]he presence of the *Pleasant Pointe* factors was adequate evidence of the debtor's impermissible purpose in filing." 113 F.3d at 1311.

(2) Other than Mr. Takaya (who welcomes, and seeks, relief from the stay or dismissal), the Debtor has only two or three creditors who are not either insiders or the Debtor's lawyers. They represent less than 8% of the Debtor's stated total claims. There certainly is not a significant creditor body to protect.

(3) The Debtor's possessory interest in the Apartment is the subject of a pending warrant of eviction, as a result of the pre-petition termination of the Debtor's leasehold, and this case was filed for the predominant purpose of blocking measures by Mr. Takaya that had been authorized by the state courts to effect the eviction of the Rosses, to utilize the automatic stay provided by section 362, to block Mr. Takaya remedies to evict the Rosses.

(4) The Debtor's financial condition is a function of its ability to realize on the profit of "flipping" the Apartment, which is in its entirety (and not just in essence) a two party dispute between the Debtor and Mr. Takaya which can be resolved in the pending litigation in the Supreme Court and First Department; indeed, this Court seems to be little more than a new locale for continuing that two-party dispute.

(5) The timing of the Debtor's filing here—after the issuance of the warrant of eviction, and one day before the warrant of eviction could be executed—evidences an intent to delay or frustrate the legitimate efforts of Mr. Takaya to secure possession of the Apartment.

(6) The Debtor has no cash flow (not just "little" cash flow).

(7) The Debtor has no cash, and no income. It has no business, other than the conduct of its lawsuit. Thus while an inability to meet current expenses is not shown, there is no business to generate such expenses.

(8) The Debtor has no employees. Nobody, not even the Rosses, looks to the Debtor for his or her livelihood.

These factors, even to the extent that they do not match up, in every regard, with the factors held in *C–TC 9th Ave.* to support a finding of bad faith filing, overwhelmingly support a like conclusion here.[109]

Additionally, other factual findings made by the Court as set forth above further cause the Court to believe that each of relief from the stay, and dismissal of this case, is warranted. Those others, which, in the Court's view likewise are material elements of the totality of the circumstances, include:

(9) The case was filed as a tactical step in connection with the Debtor's state court battles with Mr. Takaya, and with the purpose of securing a tactical advantage in the Debtor's battles with Mr. Takaya.

(10) There has been no showing of any financial pressure on the Debtor on the part of creditors other than the counter-party, Mr. Takaya, to the two-party dispute, or of financial distress as a consequence of other creditors' claims.

---

**109.** When looking at the factors and then considering the totality of the circumstances, they provide a dramatic contrast to the facts in *In re Texaco, Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y.1988), where Texaco resorted to bankruptcy after suffering an $11 billion judgment. Although Texaco found itself in its well-known difficulties as a consequence of a two-party dispute, and filed to avoid the imminent enforcement of a judgment against it, it had diverse assets, substantial operating income, a nationally known business to protect, and thousands of employees. Also, of course, it filed with the need to deal with extraordinary financial distress, and not to use bankruptcy as a vehicle to secure a profit for itself.

(11) Unsecured creditors would not benefit in any material way from the Debtor's filing, and would not be prejudiced in any material way as a result of relief from the stay.

(12) And, perhaps most importantly, this case was filed with both the purpose and effect of securing benefits for non-debtor individuals, the Rosses—continued occupancy of the Apartment and the profit on the "flipping" of the Apartment—in contrast to securing benefits for the Debtor corporation, which, as previously noted, has no ongoing business, and no intention to continue in business.

In short, this Court sees here, when it considers the invocation of its jurisdiction, the employment of a corporate shell in the United States Bankruptcy Court as a vehicle for protecting the occupancy rights of the Rosses, and advancing their litigation with Mr. Takaya in the state court, ultimately for their private financial advantage. Particularly when the additional factors are combined with the specific factors laid out in *C–TC 9th Ave.*, the Court feels firmly, in the context of the totality of the circumstances, that this case is a bad faith filing that does not belong in this Court.

Although it did not set forth explicit factors for consideration as it later did in *C–TC 9th Ave.*, the Second Circuit also dealt with matters that might justify the filing of a chapter 11 case in its earlier decision in *In re Cohoes Industrial Terminal, Inc.*, 931 F.2d 222 (2d Cir.1991). However, while *Cohoes* plainly did make reference to factors, including some relied on by the Debtor here,[110] that would make a chapter 11 filing non-frivolous, *Cohoes* principally dealt with whether it was appropriate to award sanctions under Fed. R. Bankr.P. 9011, the bankruptcy analog to Fed.R.C.P. 11, for an improper filing.

Significantly, the Second Circuit in *Cohoes* noted that "[b]ecause Bankruptcy Courts readily dismiss Chapter 11 petitions that are brought in bad faith, ... the [bankruptcy] court's initial decision not to dismiss the Chapter 11 petition, as well as its subsequent decision to reconvert the case to Chapter 11, strongly indicate that the petition itself had some valid basis in law." *Id.* at 229. That underscores, of course, the power of the Bankruptcy Courts to dismiss cases for bad faith filing (and as a power separate from that to award sanctions, which was the matter before the *Cohoes* court), hinting (but of course only hinting) that the Second Circuit's decision might not have been the same if, upon consideration of a motion under section 1112(b), it was reviewing the Bankruptcy Court's dismissal of the case.

---

**110.** The *Cohoes* court held that filing a bankruptcy petition with the intent to frustrate creditors "does not *by itself* establish an absence of intent to seek rehabilitation," noting that it is almost inevitable that creditors will, in some sense, be " 'frustrated' when their debtor files a bankruptcy petition," 931 F.2d at 228 (emphasis added), and that there is "a considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and the concept of abuse of judicial purpose." *Id.* It did not, of course, say (and its later decision in C–TC 9th Ave. said exactly the opposite) that an intent to frustrate creditors should not be taken into account when considering the totality of the circumstances.

While the *Cohoes* court also held "a debtor need not be *in extremis* in order to file a chapter 11 petition," *id.* (italics in original), it continued that a debtor "must, at least, face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future." *Id.* As the facts described above make clear, in the present case, where the Debtor has no business or operations, is a shell utilized by the Rosses for their convenience, and neither Mr. Takaya or the other creditors are pursuing the Debtor for money, the Court lacks a basis for a finding of this nature, and, even if it could, it would be only one of many factors.

It also underscores how fact-driven each of these cases is. *See id.* at 227 ("Generally, courts should conclude that a debtor has no demonstrable intent to reorganize only if, *upon considering the totality of the circumstances*, there is substantial evidence to indicate that the debtor made a bad faith filing.") (emphasis added); *see also C–TC 9th Ave.*, 113 F.3d at 1312. ("C–TC correctly points out that a determination of bad faith requires a full examination of all the circumstances of the case; it is a highly factual determination but also one that may sweep broadly.").

Because the Second Circuit's later decision in *C–TC 9th Ave.* both cited and discussed *Cohoes*, actually considered a motion under section 1112(b), and provided much more guidance to the Bankruptcy Courts in this regard, the Court believes it appropriate to focus its analysis on the factors identified by the Second Circuit in *C–TC 9th Ave.*, and those that are also appropriate in an analysis of that type.

▉ Just a few of the dozen or so factors considered by the Court here were present in *Cohoes*, and even though the Court agrees with one of the Debtor's counsel that the Court does not engage in a mechanical counting exercise with respect to the factors, the cases are qualitatively very different as well. Most significantly, *Cohoes* differed from this case in the significant respects that (1) it involved a genuine ongoing business (or more precisely, two ongoing businesses, two separate commercial real estate operations) and not a corporate shell; (2) "it [was] clear that Cohoes was encountering financial stress at the time it filed its petition," 931 F.2d at 228; (3) The *Cohoes* case was of sufficient complexity to give rise to a "long and tortured" proceeding that went on for five years, *id.* at 224; (4) the debtor

there did not file to secure a prospective financial advantage in the realization on a potential asset, in contrast to satisfying its debt; and (5) most important of all, the Cohoes debtor was not a vehicle utilized solely for its principals' personal advantage.

With that said, several other matters are appropriate for discussion. The Debtor argues that it is not using this Court to "to overrule the substantive decisions of the state courts." [111] This Court agrees, but only partially. Plainly the Debtor is not asking this Court to rule on the merits of the Supreme Court decision adverse to the Debtor, or on the merits of the First Department appeal, but its filing, as this Court has found, had both the effect and purpose of securing the stay of eviction that the First Department denied.

▉ Then the Debtor argues that it should be protected under the recent decision in this district in *In re Sletteland*, 260 B.R. 657 (Bankr.S.D.N.Y.2001) (Gropper, J.). As this Court has previously noted, *see Dabrowski*, 257 B.R. at 408, n. 30, where there is no controlling Second Circuit authority, this Court follows the decisions of other Bankruptcy Judges in the Southern District of New York, at least in the absence of clear error, and this Court has no disagreement with either the analysis in *Sletteland* or its result. But the factual picture in *Sletteland* was dramatically different than that present here, and in these fact-driven cases, where bankruptcy judges have been instructed to look at the totality of the circumstances, the factual distinctions cannot be ignored.

While it is true that Mr. Sletteland could not afford to put up money required in connection with a state court litigation and that in *Sletteland* there were few other creditors, those are the only factors that

111. Debtor Response ¶ 33.

can fairly be seen to be parallel with this case. In *Sletteland,* Judge Gropper found that there had been a failure to show that Mr. Sletteland had used the Bankruptcy Court "simply as a mechanism for frustrating [the state court plaintiffs'] efforts to gain the fruits of their litigation," 260 B.R. at 662; in this case this Court has found exactly the opposite. There, Judge Gropper found "this is not a mere two-party contest" (and indeed there another party argued against dismissal, *id.* at 667), but here this Court has found exactly the opposite. There Judge Gropper noted that "whether the debtor has a business to reorganize has been an important factor in many cases," *id.* at 664, and found this to be a factor in Mr. Sletteland's favor. *See id.* at 666. Here, by contrast, the Debtor has no business, and has not had one for at least three years; it is no more than a shell, used for its shareholders' private purposes, and that important factor is missing.

*Sletteland* involved a situation where Mr. Sletteland had suffered a massive money judgment that he could not afford to pay, and did not involve a situation where the debtor was litigating with another over which, of the two of them, would enjoy the profit on a prospective transaction. It did not involve the filing, by a corporate shell, to protect the corporate shell's shareholders from eviction, and it did not involve the use of corporate bankruptcy to protect the principals' occupancy when no corporate business was conducted in the Apartment, and where the corporation had no business at all.

In short, this case bears a similarity to *Sletteland* to the extent, but only the extent, of two or three out of a dozen factors. The totality of the circumstances here bears little resemblance to those Judge Gropper considered in *Sletteland*.[112] They are much closer to those in *Island Helicopters,* where Judge Feller, considering the totality of the circumstances surrounding the filing of a chapter 11 by a genuinely operating debtor, nevertheless found the filing to be in bad faith when it was used to block the eviction of the debtor from its heliport. *See* 211 B.R. at 462–468.[113]

■ Finally, the Debtor has stated, in its Response and oral argument, that it sincerely seeks to reorganize, and that its filing is consistent with the recognized bankruptcy goal of reorganization; it argues that if it prevails in its two-party dispute, it will be able to pay creditors 100% on their claims.[114] There is no question that many courts have considered a debtor's need and ability to reorganize, and a good faith purpose in seeking reor-

---

**112.** The Debtor also argues, citing *234–6 West 22nd St.,* cited above, and other cases, that dismissal on bad faith grounds should be granted sparingly. As noted above, this Court concurs. See discussion of that on page 34. But as also noted there, "where the circumstances require such relief, and the cases granting both types of motions are legion, a judge must not shrink from ordering it."

**113.** Judge Feller there observed:
This case is a classic manifestation of a Chapter 11 filing driven by purpose other than the legitimate aims and objectives of the statute. The case revolves entirely around a dispute over the Debtor's interest in continued possession of the Heliport . . . .

The sole purpose of the filing was to delay and frustrate termination of that interest which, after years of state court litigation and agreements with the City, had eroded to nothingness.
211 B.R. at 462. If one simply changes "Heliport" to "Apartment," and "City" to Takaya, those comments are equally applicable here, though by reason of the total lack of business of the Debtor here, and its status as a corporate shell exploited by its shareholders, the facts here are even stronger.

**114.** *See* Debtor Response ¶ 30, 37 (impliedly), 42–43.

ganization, as relevant to good faith in filing, a view with which this Court concurs. But a debtor's ipse dixit contentions in that respect cannot be regarded as trumping the Court's findings of fact as to the Debtor's intent and tactics based on the objectively verifiable record, and the totality of the circumstances. Here the Court has concluded that this case is not about making Syndicom a viable entity; it is about keeping the Rosses in their Apartment.

## III.

### Appropriate Remedy

██ As is apparent from the foregoing, the Court has found cause for each of relief from the stay and dismissal. On balance, however, the Court believes that the former is more appropriate, at least at this time. There is no indication that any of the other creditors need the ability to go after the Debtor at this time, and with the Debtor being the corporate shell that it is, it is not at all clear that proceeding against the Debtor would do any creditor, other than Mr. Takaya (who seeks possession and the ability to sell his Apartment, rather than collection on pre-petition debt) any good. Keeping the case open, at least for the time being, provides a means for the Court to maintain control to avoid further abuses. In particular, while the Court remains firmly of the view that this case has improperly invoked the jurisdiction of the Bankruptcy Court, and does not belong here, it is mindful of the warnings of Judge Hall in *Setzer, supra,* in this regard. While noting that "[b]ad faith has frequently been held to provide sufficient

cause for both types of relief," 47 B.R. at 344, Judge Hall commented:

> In view of the possibility of the filing of a new bankruptcy petition after a dismissal of a case, the lifting of the stay is often a more prudent course for creditors.

*Id.*

### Implementation

By this order, and without the need for any separate order (though, as set forth below, if any further implementing order becomes necessary for any reason, the Court will consider a request for such), Takaya's motion for relief from the stay is granted, to the extent noted below, and his motion for dismissal of the case is denied without prejudice. In that connection:

1. Takaya is granted relief from the stay, on the effective date of this order as set forth in paragraph 4 below:

> (a) to take any and all steps necessary or desirable to execute on any warrant of eviction issued by the state courts in connection with the Apartment, or otherwise to secure possession of the Apartment; and

> (b) if and to the extent relief from the stay is necessary, to sell the Apartment, and to deliver title and possession thereof to any purchaser.[115]

He does not have relief from the stay, at this time, to enforce his money judgment against assets of the estate.

2. Any marshal, sheriff or other person authorized under the law of the State of New York is authorized, but not directed,

---

115. The Apartment is the property of Mr. Takaya and not, until any purchase thereof by the Debtor, its property. Thus relief from the automatic stay with respect to a sale under such circumstances is not necessary. However, the Court grants relief from the stay in connection with a sale in any event, as a safe harbor against contentions that relief from the stay is necessary, including, without limitation, any contention that any possessory rights of the Debtor, or equitable rights of claimed ownership in the Apartment, might remain.

to take any action to implement paragraphs 1(a) and 1(b) above, or in connection therewith, notwithstanding the provisions of section 362 of the Bankruptcy Code.

3. The Debtor shall continue to be liable for use and occupancy until such time as the Debtor and the Rosses no longer are physically occupying the Apartment; the Debtor and the Rosses shall continue to be obligated to cooperate in connection with the "showing" of the Apartment; and shall continue to be obligated, so long as this chapter 11 case has not been dismissed, to meet any and all obligations of a chapter 11 debtor, including, without limitation, the filing of the operating reports required by the UST and the payment of fees to the UST.

4. Although the Court has determined that the Debtor's filing of a bankruptcy petition in this case was abusive, it believes that any litigant, including the Debtor here, should not be denied the opportunity to seek a stay of an order of the Court's order pending appeal, at least in the absence of immediate and irreparable injury, or other good cause shown. Accordingly, pursuant to Fed. R. Bankr.P. 4001(a)(3),[116] effectiveness of this order shall be stayed until the expiration of 10 calendar days from the date of entry of this order, and the Court elects not to "order[ ] otherwise." This should not be viewed as an indication that this Court would, or the District Court should, act favorably on any request for a stay. On the 11th day after

entry of this order, unless otherwise stayed by further order of this Court or the District Court, Mr. Takaya, and/or any marshal or sheriff, shall be free to proceed to proceed with any rights and remedies otherwise available under state law, including, without limitation, the execution of a warrant of eviction. The stay of effectiveness imposed under this paragraph 4 shall not apply to the obligations set forth in paragraph 3 above, all of which shall continue in effect without stay or interruption.

5. Notwithstanding the provisions of paragraph 4 above, so there is no misunderstanding, the time to appeal this order, pursuant to Fed. R. Bankr.P. 8002, shall run from the date of the entry of this order.

6. If and to the extent such is necessary, the Court will issue, at the request of any party, a stand-alone order consistent with the foregoing to address any matters not addressed in this decision and order, or to confirm any matter addressed in this decision and order. Any such order shall be settled upon all of the persons listed on the first page of this decision on three business days' notice by hand or fax, or ten business days' notice by mail.

█ 7. Mr. Takaya's supplemental request for sanctions in connection with this filing is denied. *See Cohoes*, 931 F.2d at 227, 229 (noting high standard to be met for a motion of this character, and noting the availability of the preliminary step, by the Bankruptcy Court, of dismissal for bad faith filing). The tactics of the Debtor and

---

**116.** The Advisory Committee Note to the 1999 Amendment of Rule 4001, at which time the 10–day stay of effectiveness of orders granting relief from the stay was added, provides:

> Paragraph (a)(3) is added to provide sufficient time for a party to request a stay pending appeal of an order granting relief from an automatic stay before the order is enforced or implemented....

> The stay of the order does not affect the time for filing a notice of appeal in accordance with Rule 8002. While the enforcement and implementation of an order granting relief from the automatic stay is temporarily stayed under paragraph (a)(3), the automatic stay continues to protect the debtor, and the moving party may not foreclose on collateral or take any other steps that would violate the automatic stay.

its principal Mr. Ross, a lawyer, while coming close to a reckless disregard of *C–TC 9th Ave.* (a controlling case of the Second Circuit), had colorable basis in *Cohoes, Sletteland* and other caselaw, and do not rise to such a level of egregiousness as to justify the imposition of sanctions. *See Teachers Insurance and Annuity Ass'n v. Butler,* 58 B.R. 1019, 1023 (S.D.N.Y.1986) (Weinfeld, D.J.) (denying sanctions notwithstanding questionable conduct). The Takaya request to refer this matter to the United States Attorney for this district is denied for like reason.

SO ORDERED.